UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

BETHANY MELTON, as next friend )
of R.M. )
 )
      **Plaintiff** )
 )
      v. ) No. 2:19-cv-00037
 )
**REBECCA MEDEIROS, in her** )
**individual capacity and** )
**KAYLA SNYDER, in her individual** )
**capacity** )
 )
      **Defendants** )

## MEMORANDUM OPINION

This is a civil rights action brought by Bethany Melton alleging that her son, R.M., was sexually assaulted by M.G., a foster child who had been placed into her home by the Tennessee Department of Children Services ("DCS"). Rebecca Medeiros and Kayla Snyder, DCS employees involved in the placement, have filed a Motion for Summary Judgment (Doc. No. 21) on immunity grounds. The motion has been fully briefed by the parties (Doc. Nos. 22, 26 and 29), and will be granted.

### I. Factual Background[1]

In February 2018, Medeiros, a Case Manager for DCS, received a referral for placement of siblings M.G., S.G., and B.G. because of their exposure to drugs, environmental neglect, and truancy. As a part of her investigation, Medeiros spoke with the children's maternal grandmother, Angela Lansdale.

---

[1] The facts are drawn from Defendants' Statement of Undisputed Material facts and Mrs. Melton's responses thereto (Doc. No. 28), as well as from Mrs. Melton's Statement of Undisputed Facts and Defendants' responses thereto (Doc. No.30).

On April 4, 2018, Lansdale called Medeiros and told her that, after a family team meeting with DCS, S.G. told her (Lansdale) that "her father tickles her private parts while she is sleeping." (Doc. No. 28 ¶ 4). Lansdale also reported hearing that M.G. "likes humping other people 'doing butts,'" which Medeiros took to be a reference to twerking, a dance that involves "shaking butts that can be done in pairs." (Id. ¶ 5). In addition, Lansdale stated that M.G. "had a long, skinny balloon in her mouth" one night, and told her cousin, "[t]his could be your pee pee." (Id. ¶ 6). Lansdale had no personal knowledge of these behaviors, had not witnessed them, and reported them to Medeiros "based on third hand knowledge." (Id. ¶ 8).

Lansdale claims that when she confronted Paula Bush, the children's mother, about the allegations, Bush stated that the father left his Playboys out and pornography playing on the television. Bush also allegedly told Lansdale that if the children happened to walk in on them while they were having sex, "it was just an early lesson." (Id. ¶ 9).

During a subsequent Child and Family Team Meeting on April 5, 2019, Bush denied Lansdale's allegations that the father sexually abused the children. (Id., Ex. 1 at 29). Bush also claimed that Lansdale was putting ideas into the children's heads and "coaching them into hating their own father." (Id. ¶ 11).

Medeiros does not work cases involving allegations of sexual abuse. (Id. ¶ 12). Although Medeiros knew about Lansdale's allegations regarding M.G., she did not know whether the allegations were true or untrue. (Id. ¶ 14). She concedes, however, that a child who has been the victim or perpetrator of sexual abuse should be constantly supervised. (Doc. No. 30 ¶ 13). Therefore, and in accordance with DCS protocol, Medeiros immediately referred Lansdale's allegations to Susan Bradford, a DCS Child Protective Services Investigator. Bradford, in turn, set

2

up forensic interviews for both S.G. and M.G. Those interviews were conducted by Cece Ralston of the 15th Judicial Child Advocacy Center, who specializes in talking to children about alleged sexual abuse. During the forensic interview, neither child disclosed sexual abuse, but they did disclose physical abuse by the father. (Doc. No. 28 ¶¶ 13, 14).

In a Petition to Declare Children Dependent and Neglected and for Emergency Temporary Legal Custody ("the Petition") filed with the Macon County Juvenile Court on April 19, 2018, Medeiros included Lansdale's allegations. Once the court granted the petition, Medeiros sent a copy of the Petition, the Custody Intake Packets for the children, and a detailed description of the case to the DCS placement team. It was Medeiros' understanding that this information would be provided to whoever fostered the children. (Id. ¶ 20).

Ultimately, S.G., M.G., and B.G. were place into Bethany and Kevin Melton's home. The Meltons had previously fostered almost thirty children, including R.M., who they adopted and who was four years old at the time of S.G.'s, M.G.'s, and B.G.'s placement.

On April 19, 2018, Medeiros went to the Melton's home and discussed, line-by-line, the children's Initial Intake, Placement, and Well-Being Information and History packets with Mrs. Melton. She also informed Mrs. Melton that the children had been removed from their biological parents due to substance abuse and domestic violence, but did not mention Lansdale's allegations about M.G. (Id. ¶¶ 22-24).

Medeiros also told Mrs. Melton about the sexual abuse allegations against the father, but that no disclosure of sexual abuse came out during the forensic interviews of the children. (Id. ¶ 25). Accordingly, Medeiros recommended that the children not be allowed upstairs with the older children that already lived with the Meltons, due to concern about them making false allegations of

3

abuse.  (Id. ¶ 26).  Medeiros also spoke with Mrs. Melton about R.M's Sensory Processing Disorder, and how he might react to the new additions to the home.   (Id. ¶ 28).  Thereafter, Medeiros had no further interaction with Mrs. Melton or the children. (Id. ¶ 29).

When the children were taken into DCS custody, Kayla Snyder (now Gensemer) became the assigned social worker.  On more than one occasion, Mrs. Melton asked Snyder for the Order of Protective Custody and Petition.  (Id. ¶ 31).  Because Snyder was concerned about confidentiality and privacy issues, and because she was new to DCS and did not know the proper protocol, she asked her supervisor for guidance.  (Id. ¶ 32).  Snyder never received a clear answer from her supervisor or DCS about whether she could provide the court documents to Mrs. Melton.  (Id. ¶ 33).

Once the children began living with them, the Meltons witnessed behaviors they described as sexual.  This included the children laying on their backs with their legs spread, shaking their bottoms, and pulling down their pants.  In response, Mrs. Melton set up "bubbles" where everyone had to respect each other's space.  (Id. ¶¶ 39, 40).

On July 10, 2018, Mrs. Melton sent Snyder a text message stating, "[M.G.] touched [S.G.'s] bottom while they were getting ready for bed. I asked her why and she said it looked wet so she wanted to touch it." Mrs. Melton instructed the children that "we don't touch anybody's bottoms or private parts," and informed Snyder that the children would no longer be allowed to get dressed together, or go to the bathroom together.  (Id. ¶¶ 41, 42).  Mrs. Melton asked if she should do anything else, and Snyder told her she thought the precautions were sufficient.  Mrs. Melton also expressed her relief that an in-home counselor (who Snyder had previously arranged) would be coming to help with behavioral issues.  Later, the counselor, Marcia Nastri, told Mrs. Melton that she did not think that M.G. meant the touching sexually.  (Id. ¶¶ 43-45).

4

On July 11, 2018, R.M. allegedly told Mrs. Melton that M.G. had touched her "privates." (Id. ¶ 48). Mrs. Melton reported the incident to Snyder and Nastri, and then called the DCS abuse line. That afternoon, a DCS investigator arrived at the home. R.M. and M.G. underwent forensic interviews, and the interviewer told Mrs. Melton no disclosures were made at that time, and that sometimes children lie. (Id. ¶¶ 49-52). Nevertheless, Mrs. Melton claims that, on the way home from the interview, R.M. repeated to her that M.G. had touched her privates. (Id. ¶ 53).

After the incident, Mrs. Melton asked to have the children removed from the home. However, when a replacement home in Knoxville turned out not to be viable, Mrs. Melton agreed to let the children stay with her because she had bonded with them. She also considered adopting the children, (Id. ¶¶ 53, 54), but decided not to because she was "worn out" from foster parenting. (Id. ¶¶ 53, 54, 57). The children were removed from the Melton home in November 2018. (Id. ¶ 58).

Mrs. Melton, on behalf of R.M., brings one claim against Defendants. She alleges that R.M.'s Fourteenth Amendment right to due process was violated because Defendants created a danger by placing M.G. into the home with R.M., and neither Medeiros or Snyder informed the Meltons that M.G. had a history of sexually acting out towards other children. Defendants move for summary judgment on the grounds that they are entitled to absolute and/or qualified immunity.

## II. Governing Legal Principles

The basic law governing this dispute – both procedural and substantive – is straightforward, the subject of countless decisions, and recognized by the parties. It can be summarized briefly as follows.

Procedurally, summary judgment (1) is only appropriate where there is no genuine issue as

to any material fact and the movant is entitled to judgment as a matter of law, Fed. R. Civ. P. 56(a); (2) the facts and inferences must be construed in favor of the nonmoving party, Van Gorder v. Grand Trunk W. R.R., Inc., 509 F.3d 265, 268 (6th Cir. 2007); (3) the Court does not weigh the evidence, or judge the credibility of witnesses when ruling on the motion, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); and (4) the mere existence of a scintilla of evidence in support of the nonmoving party's position is insufficient to survive summary judgment, Rodgers v. Banks, 344 F.3d 587, 595 (6th Cir. 2003). Ultimately, "whether a defendant is entitled to absolute or qualified immunity from liability under 42 U.S.C. § 1983 is a legal question," Moldowan v. City of Warren, 578 F.3d 351, 374 (6th Cir. 2009), that can be decided on summary judgment when the existing summary judgment record contains no genuine factual disputes relating to the immunity issue. See Dorsey v. Barber, 517 F.3d 389, 394 (6th Cir. 2008) (stating that qualified immunity can be decided on summary judgment where the relevant facts are undisputed, or where "defendant accepts plaintiff's version of the facts for the purpose of presenting a 'neat abstract issue of law'"); Smoak v. Hall, 460 F.3d 768, 777 (2006) (same); Filler v. Kellett, 859 F.3d 148, 152 (1st Cir. 2017) (collecting cases for the proposition that "absolute immunity, unlike qualified immunity, only rarely turns on questions of fact . . . [b]ut, that is not always the case").

Immunity, be it absolute or qualified, is not just a defense to liability, but rather immunity from suit and an entitlement not to stand trial. See Saucier v. Katz, 533 U.S. 194, 201 (2001) (qualified immunity); Mireles v. Waco, 502 U.S. 9, 11 (1991) (judicial immunity). There are certainly differences between the two however, with qualified immunity being broader in scope. Particularly apropos to 2020 and the COVID-19 era, "[t]hink of qualified immunity as a face mask and absolute immunity as a vaccine, with a presumption that qualified immunity is fit for the job."

6

Stockdale v. Helper, No. 20-5269, ___ F.3d ___, 2020 WL 6372910, at *2 (6th Cir. Oct. 30, 2020).

Absolute immunity "has traditionally been reserved for those actors 'intimately associated with the judicial phase of the criminal process.'" Spurlock v. Satterfield, 167 F.3d 995, 1003 (6th Cir. 1999) (quoting Imbler v. Pachtman, 424 U.S. 409, 430 (1976)). It, of course, applies to judges performing judicial functions. Stump v. Sparkman, 435 U.S. 349 (1978). In addition, "other court officers are absolutely immune from suit on claims arising out of their performance of judicial or quasi-judicial functions, . . . but not from suits that arise out of other conduct[.]" Holloway v. Brush, 220 F.3d 767, 774 (6th Cir. 2000) (internal citations omitted). As a consequence, "absolute immunity is determined by a functional analysis that looks to 'the nature of the function performed, not the identity of the actor who performed it.'" Id. (quoting Buckley v. Fitzsimmons, 509 U.S. 259, 269 (1993)).

Because "absolute immunity is the exception rather than the rule," Spurlock, 167 F.3d at 1003, however, "[t]he presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties," Burns v. Reed, 500 U.S. 478, 486–87 (1991). Thus, courts have been "'quite sparing' in extending absolute immunity to state actors in the § 1983 context," and "the official seeking absolute immunity bears the burden of showing that [absolute] immunity is justified for the function in question." Rieves v. Town of Smyrna, 959 F.3d 678, 691 (6th Cir. 2020) (bracket in original) (citation omitted).

Qualified immunity, on the other hand, shields all public officials performing discretionary functions from liability in personal-capacity lawsuits, so long as their actions do not violate clearly established constitutional rights of which a reasonable person would have known. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Once the defense is raised, a plaintiff must come forward with

7

evidence from which a jury could find "(1) that the official violated a statutory or constitutional right, and (2) the right was 'clearly established' at the time of the challenged conduct." Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011). Both prongs must be met, and judges "can exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Pearson v. Callahan, 555 U.S. 223, 236 (2009).

### III. Application of Law

Applying the procedural and substantive law to the facts of this case, is relatively straight-forward. Procedurally, the critical facts that Defendants concede for purposes of the immunity analysis are that neither Medeiros nor Snyder told Mrs. Melton about what Lansdale said about R.M., and neither presented Mrs. Melton with the Petition that contained those allegations. Those undisputed facts make clear that neither Defendant is entitled to absolute immunity because neither was functioning in a judicial or quasi-judicial capacity when they failed to make the disclosure.

To be sure, social workers are entitled to absolute immunity, but "only when they are acting in the capacity of *legal advocates*." Holloway v. Brush, 220 F.3d 767, 774 (6th Cir. 2000) (emphasis in original). Thus, for example, social workers are entitled to absolute immunity when prosecuting child delinquency petitions, Salyer v. Patrick, 874 F.2d 374, 377–78 (6th Cir. 1989),[2] or when they act as witnesses in a removal proceeding, Brent v. Wayne Cty. Dep't of Human Servs., 901 F.3d 656, 685 (6th Cir. 2018), but not when they execute a removal order because they are then "acting in a police capacity rather than as legal advocates," Kovacic v. Cuyahoga Cty. Dep't of Children &

---

[2] In such circumstances, the doctrine applies even if social workers make knowingly false statements in a petition for removal, " no matter how undesirable the result." Pittman v. Cuyahoga Cty. Dep't of Children & Family Servs., 640 F.3d 716, 725 (6th Cir. 2011)

8

Family Servs., 724 F.3d 687, 694 (6th Cir. 2013), or when deciding whether to open or continue an investigation, or to enter a parent's name in a register of abusers, because these functions are administrative or investigative in nature, rather than prosecutorial. Achterhof v. Selvaggio, 886 F.2d 826, 830 (6th Cir. 1989).

Here, the only time either Defendant acted as a "legal advocate" was when Medeiros drafted the Petition and presented it to the court for its consideration. Absolute immunity is simply not a viable defense in this case.

Qualified immunity, on the other hand, is appropriate because the defenses turns not upon Defendants' function or role, but upon whether a right was clearly established. For a right to be clearly established,

> "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. [I]n the light of pre-existing law the unlawfulness must be apparent." Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). In other words, "existing precedent must have placed the statutory or constitutional question . . . beyond debate." Plumhoff v. Rickard, ––– U.S. ––––, 134 S.Ct. 2012, 2023, 188 L.Ed.2d 1056 (2014) (internal quotation marks omitted) (quoting Ashcroft v. al–Kidd, ––– U.S. ––––, 131 S.Ct. 2074, 2083, 179 L.Ed.2d 1149 (2011)). "[B]inding precedent from the Supreme Court, the Sixth Circuit, [or] the district court itself" can provide such clarity; persuasive authority from "other circuits that is directly on point" may also demonstrate that a law is clearly established. Holzemer v. City of Memphis, 621 F.3d 512, 527 (6th Cir.2010). Notwithstanding those helpful indicators, "[a] court need not have previously held illegal the conduct in the precise situation at issue because officials can still be on notice that their conduct violates established law even in novel factual circumstances." Sutton v. Metro. Gov't of Nashville, 700 F.3d 865, 876 (6th Cir.2012) (internal quotation marks omitted).

Occupy Nashville v. Haslam, 769 F.3d 434, 442–43 (6th Cir. 2014).

In regard to the central issue in this case, *i.e.* whether a reasonable social worker would understand that placing M.G.'s into the Melton home would result in a constitutional deprivation,

9

the parties rely upon two decisions from former judge Robert L. Echols of this court. Mrs. Melton cites his decision in Lopez v. Metropolitan Government of Nashville and Davidson County, 646 F. Supp.2d 891 (M.D. Tenn. 2009), for the proposition that Defendants were "on notice that subjecting a special-needs child to another child with a history of sexual aggression creates a danger to the special-needs child." (Doc. No. 26 at 5). In response, Defendants argue that "this case is far more akin to" Staehling v. Metropolitan Government of Nashville and Davidson County, Case 2:19-cv-00037, 2008 WL 34279839 at *1 (M.D. Tenn. Sept. 12, 2008).

Qualified immunity was not at issue in either Lopez or Staehling. Instead, the issue in both cases was whether the Nashville metropolitan school district could be held liable for a due process violation under the "state-created danger theory," which is predicated upon affirmative acts by the state that "either create or increase the risk that an individual will be exposed to private acts of violence." Kallstom v. City of Columbus, 136 F.3d 1055, 1066 (6th Cir. 1998). This theory requires a plaintiff to show: "(1) an affirmative act by the state which either created or increased the risk that the plaintiff would be exposed to an act of violence by a third party; (2) a special danger to the plaintiff wherein the state's actions placed the plaintiff specifically at risk, as distinguished from a risk that affects the public at large; and (3) the state knew or should have known that its actions specifically endangered the plaintiff." Cartwright v. City of Marine City, 336 F.3d 487, 493 (6th Cir. 2003).

Judge Echols found a triable issue in Lopez. Construed in plaintiff's favor on the summary judgment record, the facts showed that Gilberto, a nine-year old disabled boy, was raped on a special needs bus on May 7, 2007, by Kolby, a 19 year-old student. Judge Echols opined that a reasonable jury could "conclude that Metro had to have known of the obvious risk of Kolby potentially

10

assaulting another student on a school bus without a monitor or some sort of special safety precautions" because, among other things: (1) on August 20, 2003, Kolby was disciplined for engaging in a sexual act in his school; (2) in September 2005, Kolby was suspended for having oral sex and sexual intercourse with a student in the girls' bathroom, which prompted a safety plan that required he be escorted on school grounds by an adult; (3) in January 2005, Kolby was suspended again for exposing his penis to a student on the school bus and telling the student that he was going to show the "new kid" his "privates" and "do it" to him, which resulted in a bus safety plan; (4) in December 2005, Kolby was again suspended for having engaged in sexual activity with another student; and (5) in May 2006 it was alleged that Kolby touched the "private parts" of yet another student. 646 F. Supp. 2d at 911.

Given these allegations, it was hardly surprising for Judge Echols to conclude that "[a] jury could determine from these facts and circumstances that Metro was deliberately indifferent or subjectively reckless because of the potential risk of harm to Gilberto." Id. In so ruling, Judge Echols distinguished his prior decision in Staehling:

> While that case involved a sexual assault by one special education student on another special education student on a school bus designated for special education students, the alleged perpetrator in that case was not nineteen years old and did have Kolby's record of sexually activity and abuse of younger students. . . . Quite the contrary, the evidence showed only that the perpetrator in Staehling had once kissed his victim weeks before the incident, but that incident was only reported to the school bus driver. While there had been previous generalized complaints about misconduct on special needs school buses and a "vanilla letter" from the Department of Education about assaults on such buses, those things "did not portend the type of harassment that is alleged to have occurred in this case some eight years later." Staehling, 2008 WL 4279839 at *10). Staehling is factually inapposite.

Id.

This Court agrees with Defendants that the facts here are much closer to Staehling than

11

Lopez because there was no concrete evidence that R.M. had acted out sexually in the manner alleged by Lansdale. To their credit, Medeiros passed the allegations on to DCS for investigation and presented them to the judge in the petition, and Snyder sought guidance from higher-ups as to whether she could share the petition with others, given confidentiality issues and privacy concerns. Lopez does not require that every rumor and allegation made against a child in DCS's custody be passed on to prospective foster parents, and "it would [not] be clear to a reasonable [social worker] that h[er] conduct was unlawful in the situation [s]he confronted," Saucier, 533 U.S. at 202, particularly when both Lopez and Staehling are considered in tandem. See Ryan v. Blackwell, No. 19-6447, ___ F.3 ___, ___, 2020 WL 6437973, at *5 (6th Cir. Nov. 3, 2020) (noting that "for a right to be clearly established the constitutionality of the officer's conduct must have been beyond debate in the particular circumstances before him," and that "[o]nly when 'every reasonable official' would have known his conduct violates that right should the courts deny protection to that official"). Besides, "[a] single district court opinion is not enough to pronounce a right is clearly established for purposes of qualified immunity. While a district court opinion may be persuasive in showing there is a clearly established right – perhaps by exposing a trend in non-precedential case law – it is not controlling on its own." Hall v. Sweet, 666 F. App'x 469, 481 (6th Cir. 2016); see also al-Kidd, 563 U.S. at 741–42 (stating that "[e]ven a district judge's *ipse dixit* of a holding is not 'controlling authority' in any jurisdiction," and that "what is necessary absent controlling authority [is] a robust consensus of cases of persuasive authority.").

Lopez aside, Mrs. Melton cites several subsections of Tenn. Code Ann. § 37-2-415 that she says "required [Defendants] to inform Mrs. Melton of M.G.'s history of sexually acting out with other children." (Doc. No. 26 at 6). She goes so far as to highlight language that says such things

12

as "the department **shall** inform," or "the department **shall** allow," or "the department **shall** provide **all information**," or "**the foster parent shall be informed**." (Id. at 6-7). However, the statute, which is colloquially referred to as "the Foster Parents Bill of Rights" hardly imposes mandatory duties on social workers. Instead, it dictates that DCS "shall, through promulgation of rules in accordance with the Uniform Administrative Procedures Act . . . implement the following tenets," Tenn. Code Ann. § 37-2-415(a), among which are those that Mrs. Melton cites. Regardless, the mere failure to follow state law does not automatically a constitutional violation make. See Davis v. Scherer, 468 U.S. 183, 194 n.12, (1984) ("Neither federal nor state officials lose their immunity by violating the clear command of a statute or regulation—of federal or state law—unless that statute or regulation provides the basis for the cause of action sued upon"); Cooper v. County of Washtenaw, 222 Fed. App'x 459, 470 (6th Cir. 2007) ("A violation of internal policy does not ipso facto give rise to a presumption of unconstitutionality."); McLenagan v. Karnes, 27 F.3d 1002, 1008 (4th Cir. 1994) (an asserted violation of state law is almost always insufficient to sustain a federal claim under § 1983).

## IV. Conclusion

On the basis of the foregoing, an appropriate Order will enter granting Defendants' Motion for Summary Judgment (Doc. No. 21).

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE